IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Ed Schmidt Pontiac-GMC Truck, Inc.,                Case No. 3:04CV7621

    Plaintiff

v.                                                 ORDER

DaimlerChrysler Motors Company, LLC,

    Defendant

This is a suit by an automobile dealership, Ed Schmidt Pontiac-GMC Truck, Inc. [Schmidt], against DaimlerChrysler Motors Company [DaimlerChrysler]. Pending is Schmidt's motion for a preliminary injunction. For the reasons that follow, the motion shall be granted.

**Background**

Schmidt, which is located on Dixie Highway in Perrysburg, Ohio, has what is known as a "dualed" dealership, in that he sells both General Motors vehicles and Jeeps, which are produced by DaimlerChrysler. Schmidt obtained the Jeep franchise in 2003 by the purchase of Southwyck Jeep, which had operated in south Toledo.

Schmidt's ability to consummate the purchase required approval from DaimlerChrysler. DaimlerChrysler did not give the requisite approval. This led to a suit by Schmidt against DaimlerChrysler. That suit was resolved by a 1993 settlement agreement, whereby the Southwyck Jeep franchise was transferred to Schmidt.

In 1994, Schmidt sought to consolidate the Southwyck Jeep outlet with Schmidt's main facility in Perrysburg. Another Toledo-area Jeep dealer, Yark Oldsmobile-Jeep [Yark] protested such relocation under O.R.C. § 4517.50(A).[1] Yark anticipated that, as a result of implementation of that reorganization, Schmidt might obtain a Chrysler franchise. Were that to occur, Yark, which, like Schmidt, was a dualed dealer, selling Oldsmobiles as well as Jeeps, may have been at a competitive disadvantage vis-a-vis Schmidt.

Moreover, if Schmidt obtained a Chrysler franchise, Schmidt would be able to pursue a § 4517.50(A) protest against a subsequent grant by DaimlerChrysler of a Chrysler franchise to Yark, as that franchise would be within Schmidt's ten-mile zone of protection under that section.

Yark had informed DaimlerChrysler in December, 1993, that it might be interested in purchasing Valiton Chrysler-Plymouth, also located in west Toledo about three miles from Yark's premises. To consummate that purchase, Yark would have needed DaimlerChrysler's approval, just as Schmidt required DaimlerChrysler's permission to purchase Southwyck Jeep.

In this context, Yark's § 4517.50(A) protest of the move of Schmidt's Jeep franchise to its Perrysburg location resembled an opening gambit in a chess game. By this point, Schmidt had purchased Southwyck Jeep-Eagle [and had received approval of the purchase via the 1993 settlement with DaimlerChrysler], wanted to relocate the Jeep franchise, and desired a Chrysler franchise. At

---

[1] Under O.R.C. § 4517.50(A), an auto dealer can protest introduction of another dealer in the same line of vehicles into an area within ten miles of the dealership. This provision protects a franchisee-dealer from actions by the franchisor-manufacturer, with its superior economic strength, which would bring a competitor selling the same line of vehicles into adversely close proximity to the dealer.

Though Schmidt's move of its Jeep franchise would have taken it farther away from Yark's location in west Toledo, Schmidt's Jeep franchise, when relocated to the Perrysburg facility, would still have been within ten miles of Yark's location.

the same time, Yark was eyeing the Valiton Chrysler franchise, which Yark would, at some point, want to relocate to Yark's main facility.

In making this move, Yark was pursing another, and more important objective: namely, to ensure that, if DaimlerChrysler gave Schmidt a Chrysler franchise, DaimlerChrysler also would approve Yark's acquisition and relocation of Valiton. Yark also wanted to avoid a protest by Schmidt of the relocation of the Valiton Chrysler franchise.

Were all that to occur, both Yark and Schmidt would be selling Chryslers, Jeeps, and GM vehicles. Thus, parity between Yark and Schmidt would exist: neither dealer would have the competitive advantage that results from offering more vehicle lines than the other.[2]

But for these longer range objectives, Yark probably would have been pleased to see Schmidt take the Southwyck Jeep franchise across the Maumee River and farther away from its own operations in west Toledo. That short-term benefit was, though, insignificant compared to the prospect of securing and moving the Valiton Chrysler franchise.

Yark's protest ultimately laid the groundwork for a three-way understanding about the process by which Yark and Schmidt would obtain Chrysler franchises in the future.

---

[2]

The evidence demonstrates that DaimlerChrysler intended to maintain the parity that resulted from Schmidt's acquisition of Southwyck Jeep. DaimlerChrysler understood that Yark, if it "had some comfort level that he and Schmidt would get Chrysler at the same time . . .[,] would drop [its] protest." Dep. of James Dimond.

Yark's desire to ensure that such parity would exist without the interference of a § 4517.50(A) protest by Schmidt is likewise clear. As Yark's lawyer wrote to DaimlerChrysler in December, 1993, "Yark would like a provision in any Settlement Agreement" of its § 4517.50(A) protest of the relocation of Schmidt's Jeep franchise "that, if [Yark] were to . . . [buy] Valiton's Chrysler Plymouth franchise . . . that Schmidt would not protest [an ensuing] relocation" of that franchise to Yark's premises. [Pl. Exh. 9].

3

That understanding was reached on March 30, 1994, in a Settlement Agreement between DaimlerChrysler, Schmidt and Yark. The agreement stated:

1. Yark will immediately dismiss with prejudice [its] Protests . . . .

2. The parties agree that [DaimlerChrysler] will not *award* Chrysler-Plymouth Sales and Service Agreements ("C-P SSA's) to either Yark or Schmidt unless and until C-P SSA's [sic] can be *awarded* to both without protest or litigation by any dealer.

3. The parties agree that prior to being granted C-P SSA's, Yark and Schmidt will have met all usual and customary requirements for the appointment as a Chrysler-Plymouth dealer.

4. Yark and Schmidt agree that neither will protest the other's award of a Chrysler-Plymouth SSA.

Exh. 1 [emphasis supplied].

Yark dismissed its protest. Schmidt moved its Jeep operation to Perrysburg. Then nothing happened for about nine years, until Yark finally purchased Valiton. On learning that Yark was doing so, Schmidt, anticipating that DaimlerChrysler would approve both the sale of that franchise to Yark and its relocation, demanded that DaimlerChrysler grant Schmidt a Chrysler franchise pursuant to the 1994 Settlement Agreement.[3]

In response, DaimlerChrysler told Schmidt that the Agreement did not apply to this situation because DaimlerChrysler was not "awarding" a Chrysler franchise to Yark. Yark, rather, was merely acquiring an existing franchise through a buy/sell agreement. Acquisition of a franchise in that manner, DaimlerChrysler asserted, was not the same as an "award," as that term was used in the Settlement Agreement.

---

[3] Because Schmidt did not then have a Chrysler franchise, Schmidt could not assert a § 4517.50(A) protest against the relocation of the Valiton franchise, following Valiton's purchase by Yark, to Yark's premises.

4

Disagreeing with this interpretation of the Agreement, Schmidt filed this lawsuit.

As all this was occurring, another dealer, Al Smith Chrysler Dodge [Smith], located on Dixie Highway in Bowling Green, Ohio, was an attentive bystander.

Smith has a smaller operation than either Yark or Schmidt. This is caused, in part, by the fact that its premises are not large enough to build a bigger showroom and service facility. It is, in effect, landlocked.

In response to this circumstance, Smith purchased in 1978 a forty-acre parcel north of Bowling Green. Smith has periodically contemplated moving its Chrysler franchise to that location. In 2001, Chrysler approved Smith's doing so.[4] But Smith has remained at its present location.

Though Smith presently is more than ten miles from Schmidt's Perrysburg location, its forty-acre parcel is within the ten-mile zone protected by § 4517.50(A). Smith has recently decided that it now wants to develop that parcel and expand, upgrade, and update its operations. Thus, it has been negotiating with DaimlerChrysler for approval to relocate its franchise to that location. If that approval were forthcoming, Smith would be able to assert § 4517.50(A) protest rights were Schmidt to obtain a Chrysler franchise.

In light of the revival of Smith's relocation desires and its renewed negotiations with DaimlerChrysler, Schmidt has filed its pending motion for preliminary injunction. That motion seeks

---

[4]

Smith claims that it never received notification of that approval. I do not find that testimony plausible: had Smith, in fact, not heard in due course from DaimlerChrysler about its request to relocate its franchise, I have no doubt that it would have contacted DaimlerChrysler to find out what was going on with its relocation request. That it did not do so, plus the fact that relocation is important to the future well-being of its dealership, persuades me that Smith received notice of DaimlerChrysler's approval and decided, for whatever reasons, to stay put. It is also reasonable to infer that Smith, once having received approval, could anticipate that, if it later renewed its request, it would encounter no problems.

to prevent further negotiations between Smith, who has been granted leave to intervene in this suit, and DaimlerChrysler until final determination of Schmidt's rights under the 1994 Settlement Agreement.[5]

## Discussion

### 1. Standards for Injunctive Relief

As the Sixth Circuit has often stated:

> To determine whether to grant a preliminary injunction, a district court must consider: "(1) the plaintiffs' likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest." "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." Thus, even though a finding of no likelihood of success "is usually fatal[,]" a district court should ordinarily analyze all of the factors.

*Abney v. Amgen, Inc*., 443 F.3d 540, 546-47 (6th Cir. 2006) (citations omitted).

For the reasons that follow, I conclude that all of the factors favor granting injunctive relief in favor of Schmidt and against DaimlerChrysler.

### 2. Likelihood of Prevailing on the Merits

A crucial question is whether Schmidt is likely to prevail on the merits of its claim that DaimlerChrysler breached the Settlement Agreement when it approved Yark's purchase of Valiton and relocation of that franchise to Yark's west Toledo premises.

---

[5] Schmidt contends that under the Agreement, it should have been granted a Chrysler franchise when Yark obtained approval to purchase Valiton. Had it obtained the franchise then, Schmidt would be in a position to protest Smith's relocation of Smith's franchise to the forty-acre parcel.

I conclude, for the reasons discussed below, that there is a substantial likelihood that Schmidt will prevail on its claim that DaimlerChrysler breached the Settlement Agreement by not giving Schmidt a Chrysler franchise when it gave a franchise to Yark.

### a. Meaning of the Term "Award"

At the heart of this lawsuit is the 1994 Settlement Agreement between DaimlerChrysler, Schmidt, and Yark. Schmidt claims that the Agreement promised that, if Yark obtained a Chrysler franchise, Schmidt would get one also. By failing to have concurrently granted Schmidt a franchise in 2003, when Chrysler approved Yark's purchase of Valiton, Schmidt contends that Chrysler breached the Agreement.

DaimlerChrysler contends, in response, that the term "award," as used in the Agreement, means obtaining a franchise directly from DaimlerChrysler, as opposed to the only other way in which a franchise can be acquired – by purchase from the owner of an existing franchise.

Relying on the putative distinction between "award" and purchase, DaimlerChrysler asserts that it did not breach the Settlement Agreement because it did not "award" the Valiton franchise to Yark. Instead, Yark purchased it; DaimlerChrysler merely approved the purchase and, subsequently, approved the relocation of the franchise to Yark's premises.

Such acquisition not being by way of award, Schmidt, in DaimlerChrysler's view, has nothing to complain about.

Schmidt argues in response that, regardless of DaimlerChrysler's evidence of custom and usage with regard to manufacturers and dealers, use of the term "award" in the Settlement

7

Agreement did not have the limited meaning ascribed to it by Chrysler. In making this argument, Schmidt looks to the circumstances leading up to the Agreement.[6]

There is no evidence, either within the Agreement itself, or in the circumstances leading to the Agreement, suggesting that in 1993-94 either Yark or Schmidt was contemplating acquiring an entirely new Chrysler franchise. Nor is there any evidence that DaimlerChrysler was contemplating extending a new franchise to either of these parties or to anyone else in the Toledo area.

What the record does show, however, is that Yark's protest of Schmidt's relocation of Southwyck Jeep [acquired by Schmidt by purchase] was motivated, at least in part, by Yark's anticipation that Yark might try to acquire the Valiton franchise by purchase – as, in the fulness of time, it did. Indeed, Yark told DaimlerChrysler if it "had some comfort level that he and Schmidt would get Chrysler at the same time[,] he would drop his protest." Dep. of James Dimond. Yark also told DaimlerChrysler that Yark wanted to reach an understanding that, if Yark purchased Valiton, Schmidt would not protest an ensuing relocation of the franchise to Yark's west Toledo premises.

One could speculate that Schmidt harbored some hope that it would be "awarded" a new franchise; but no evidence suggests that such was or had been the case prior to or at the time the

---

[6]

Although parol evidence cannot be used to determine what a party intended, parol evidence and other extrinsic evidence can properly be used to explain the conditions surrounding execution of an agreement. *See Morgan v. Boyer*, 39 Ohio St. 324 (1883) (Syllabus ¶ 3) ("The language used is to be understood in its plain and ordinary sense, as read in the light of the surrounding circumstances, the situation of the parties, and the object . . ., and that construction given which most nearly conforms to the intention of the parties."); *see also Stony's Trucking Co. v. Public Utilities Commission*, 32 Ohio St. 2d 139, 142 (1972) (where "the language of a document is general, reference to the circumstances surrounding the formation of the document is necessary to a complete understanding of the agreement contained therein."). Thus, where extrinsic "evidence was not used to vary the terms of the party's agreement, but only to help the court interpret the intent of the parties," consideration of such evidence is permissible. *Howard Johnson Company v. Hotel Kingmyer Properties, Inc*., 1977 WL 200692, *7 (Ohio App.).

Agreement was negotiated and signed. There is, likewise, no evidence that DaimlerChrysler contemporaneously communicated to either Yark or Schmidt that it viewed the term "award" as having a limited, rather than a more common and general, meaning.

This conclusion – that an "award," as contemplated by the parties, meant acquisition, either by grant of a new franchise or purchase of an existing franchise – is supported by other provisions in the Agreement. Paragraph 3 of the Agreement states that before "being granted SSA's, Yark *and* Schmidt will have to meet all usual and customary requirements" for a franchise. [Emphasis supplied]. Use of the conjunctive, rather than the disjunctive, in this paragraph suggests an expectation that both would "be granted SSA's."[7]

In addition, ¶ 4 also uses the term "award," and it does so, moreover, in a context which likewise indicates that the parties were using the term broadly, as Schmidt contends, rather than narrowly, as DaimlerChrysler contends. That provision states: "Yark and Schmidt agree that neither will protest the other's award of a Chrysler-Plymouth SSA."

One purpose of the Agreement – to eliminate the risk of protest by either Yark or Schmidt – would be frustrated if "award" meant only the grant of a new franchise, but not acquisition of a franchise by purchase.

Similarly – and more importantly – a restrictive reading of the term "award" would have frustrated a major purpose of the Agreement – to have DaimlerChrysler treat Yark and Schmidt with

---

[7] I note that the Agreement, with grammatical imperfection, refers to "SSA's." The possessive form of the singular, as thus used in the Agreement, simply does not fit. It is apparent, and I have no doubt, that the drafter meant to use "SSAs." This usage would, in context, be grammatically correct – and indicative of an intent to refer to Sales and Service Agreements *plural*. This, in turn, indicates that the parties contemplated issuance and Service Agreements to both Yark and Schmidt, were either one to obtain a Chrysler franchise.

parity. I am persuaded that that was a major objective of the Settlement Agreement. The mutual waiver of protest rights in ¶ 4 attained that objective: all parties knew that no protest would be forthcoming against one of the dealers after the other had received its franchise. Omission of the mutual waiver provision would have put the goal of parity at risk.

Parties do not enter into contracts that cannot fulfill the parties' essential objectives. Those objectives here were to end the current dispute, prevent future disputes between Yark and Schmidt as both undertook to expand their businesses, and ensure that DaimlerChrysler would treat both equally.

If the term "award" in this contract means what DaimlerChrysler says it does, none of those purposes could be attained. Nor has the principal objective – parity between the dealers – been obtained. That's why this suit is pending.

Thus, both from the standpoint of 1) what led to the Settlement Agreement – Yark's interest in purchasing and relocating Valiton and Yark's apprehension that Schmidt, if it obtained a Chrysler franchise before Yark consummated the Valiton purchase, would protest relocation of Valiton – and, 2) as well, in light of the purposes of the Agreement – to end the instant dispute, preclude future disputes, and ensure future parity between the dealers – the term "award" in the Agreement does not have the meaning advanced by DaimlerChrysler.[8]

---

[8]

DaimlerChrysler also argues that an expansive, rather than a narrow, reading of the term "award" will enable Schmidt to get for free that for which Yark paid millions – a Chrysler franchise. This is so, DaimlerChrysler argues, because a dealer does not pay DaimlerChrysler for a new franchise, whereas a dealer who purchases an extant franchise necessarily expends a lot of money.

This argument overlooks the fact that Schmidt will have to invest a lot of money in facilities to meet DaimlerChrysler's requirements – especially the requirement of exclusivity – for its Chrysler franchisees. In addition, Schmidt will have to pay for advertising and other efforts to generate the good will that came with Yark's acquisition of Valiton. Whether Schmidt would have to invest as

**b. Potential Protest by Any Other Dealer**

DaimlerChrysler's defense of Schmidt's claim that DaimlerChrysler breached the Settlement Agreement does not rely, however, solely on DaimlerChrysler's interpretation of the term "award." Among its other arguments as to the likelihood of Schmidt prevailing, DaimlerChrysler asserts that ¶ 2, which provides that DaimlerChrysler "will not award Chrysler-Plymouth Sales and Service Agreements (C-P SSA's) to either Yark or Schmidt unless and until C-P SSA's can be awarded to both without protest or litigation by any dealer" means that DaimlerChrysler could choose to give a franchise to only one of them if no other dealer could protest an award to either of them.

In other words, DaimlerChrysler claims that ¶ 2 allowed it to give a franchise solely to Yark because no dealer could have protested the grant of a franchise to either Yark or Schmidt.

This was so because, when Yark got the award, Schmidt, not being at the time a Chrysler dealer, could not protest under § 4517.50(A). And there was no other Chrysler dealer whose ten-mile zone under § 4517.50(A) would be affected by Yark's acquisition of a Chrysler franchise.

There also was no Chrysler dealer within ten miles of Schmidt who could have protested if Schmidt were to have gotten a franchise.

Thus, DaimlerChrysler contends that it did not breach the Settlement Agreement because, when it approved Yark's purchase and relocation of Valiton, no other Chrysler dealer was able to protest that event, and none could have protested Schmidt's getting a franchise.

The absence of a potential dealer-protester was, in DaimlerChrysler's view, the only precondition to its ability to choose to whom to grant a Chrysler franchise. That condition being met,

---

much as Yark invested is not material; what matters is that Schmidt's acquisition of a Chrysler franchise is not the same thing, despite DaimlerChrysler's contention to the contrary, as a "free ticket."

DaimlerChrysler claims that it fulfilled its obligations under the Agreement. That Agreement thus, DaimlerChrysler contends, permitted it to grant a franchise unilaterally to Yark, without doing so bilaterally to Yark and to Schmidt.

This argument ignores the primary reason for Yark and Schmidt to enter into the Agreement: to ensure parity between them in any future effort to obtain a Chrysler franchise. Before reaching that Agreement, Yark was a dualed dealer with a Jeep franchise at a single location; its protest put Schmidt's ability to achieve the same status, despite Schmidt's purchase of Southwyck Jeep, in doubt. But Yark made that protest because it feared that Schmidt might get a Chrysler franchise before it did, and thus be able to protest relocation of Valiton.

On execution of the Settlement Agreement, parity was accomplished – Yark became a dualed dealer with a Jeep franchise – and future parity was assured. That is what Yark and Schmidt wanted, and that served DaimlerChrysler's interests as well. Future parity of treatment, coupled with the mutual waiver of the right of protest, eliminated the risk of future squabbles between Chrysler and the dealers, and between the dealers themselves.

This result was not inconsequential, even if, as DaimlerChrysler contends, Schmidt overstates its annoyance in 1994 with either or both dealers, their machinations, and mutual disputatiousness. Even if corporate annoyance weren't a factor [though it appears that it may well have been], DaimlerChrysler gained something in addition to a truce between warring factions: by agreeing to treat both equally when awarding Chrysler franchises, DaimlerChrysler could proceed with a freer hand than otherwise with regard to any Toledo-area decisions relating to both existing and potentially new franchises.[9]

---

[9] That DaimlerChrysler's subsequent actions in allowing Yark to obtain a franchise unilaterally may

Thus, to read the concluding phrase of ¶ 2 – the "unless and until" SSAs can be awarded to both without protest by any other dealer – as DaimlerChrysler urges, ignores the purposes, as noted above, of the Agreement.

A more sensible reading of that provision takes into account, as DaimlerChrysler's argument on this issue does not, the long-standing interest of Smith to relocate to within ten miles of Schmidt. Smith already owned enough property to do so. Were Smith to seek permission to move, Schmidt could not [until Schmidt had its own Chrysler franchise] protest relocation of Smith's dealership.

Had Smith sought to move, and been permitted to do so, moreover, the commitment to parity embodied in the Agreement, and the desire for parity which drew Yark and Schmidt to sign the Agreement, would have been maintained.

That is so, because pursuant to the "unless and until" provision, an award to Yark could not be made because no award could be made concurrently [or at all] to Schmidt without protest by Smith. In other words: had Smith relocated, DaimlerChrysler could not have awarded a Chrysler franchise to either Yark or Schmidt, because of the prospect of Smith's protest of an award to Schmidt.

This "unless and until" clause, to which DaimlerChrysler points to justify its disparate treatment of Schmidt, maintains the promise of parity, rather than defeats it.[10]

---

have defeated that objective does not matter. As of 1994, matters had been clarified and resolved, current disputes were ended, and future disputes were avoided. Effective and efficient planning is more likely in times of peace than in times of war.

[10] Smith appears, moreover, to be the only potential Chrysler dealer who could have protested a grant of a franchise to Schmidt [had Smith been permitted previously to relocate to its forty-acre property]. There is no evidence in the record that any other franchise was likely to be granted to someone else within ten miles of Yark or Schmidt. The "any dealer" language in the "unless and until" clause appears likely, therefore, to mean only one dealer – Smith.

I conclude, accordingly, that the "unless and until" clause in the Agreement further ensured that the parity accomplished by giving a franchise to either Yark or Schmidt only if both could, with protest from another dealer, obtain a franchise, secured, rather than threatened, that parity. Where one dealer's receipt of a franchise might be threatened [as most likely would occur if Smith relocated to property it already owned], then that barrier to Schmidt's getting a franchise applied as well to Yark's ability to do so.

That provision would then have operated in a way that also protected DaimlerChrysler's objectives in signing the Agreement. It would not have been necessary for Smith to protest for it to decline to award a franchise to Yark or Chrysler: it was enough that Schmidt was within ten miles of Smith, and thus subject to a potential protest by Smith. Thus, to the extent that DaimlerChrysler signed the Agreement out of a desire to shut down protests, the "unless and until" clause, read as I do, accomplished that purpose.

Finally, such reading maintained the free hand that DaimlerChrysler acquired through the Settlement. If its long-range or other plans developed or so dictated, it could reconfigure its Chrysler franchises in the Toledo area either by letting Smith move, thereby precluding awards to Yark and Schmidt, or, were Yark and Schmidt unhappy with that prospect, by conditioning an award of franchises to both on a waiver of the "unless and until" clause.[11]

### c. Satisfaction of "Usual and Customary Requirements"

---

Even if this were not so, the result remains the same: DaimlerChrysler's reading of that clause, by facilitating disparate treatment, would defeat the purpose of all the parties – including its own purpose – to enable and ensure parity between Yark and Schmidt in DaimlerChrysler's future grant of a Chrysler franchise.

[11] To be sure, Smith, having moved, would be entitled in that circumstance to lodge a § 4517.50(A) protest, which DaimlerChrysler would have to defend.

14

DaimlerChrysler also argues that, even if I disagree [as I do] with its reading of ¶ 2 of the Agreement, Schmidt in 2003 was not, and still is not, in compliance with ¶ 3.

That provision states that: "The parties agree that prior to being granted C-P SSA's, Yark and Schmidt will have met all usual and customary requirements for the appointment as a Chrysler-Plymouth dealer."[12] Those "usual and customary requirements" are, *inter alia*, that the franchisee have a facility dedicated exclusively to the Chrysler franchise, and that the dealer and its facility meet certain capital, space, and other conditions.

I do not understand DaimlerChrysler to be arguing that a potential franchisee has to meet all its requirements before being awarded the franchise. Instead, it appears that such award is made conditionally. Only after being notified that it will receive a franchise, would a dealer, according to my understanding, spend the money needed to meet DaimlerChrysler's conditions, as expressed in DaimlerChrysler's usual and customary requirements.

I note that, when Yark received approval to purchase the Valiton franchise, Yark could not meet all the requirements. That being so, Schmidt cannot be faulted, much less found not likely to succeed, because it did not then and has not yet shown that it can meet all the usual and customary requirements as a franchisee. No dealer could long survive if it had to make the requisite investment entirely in advance before it could be assured that it would obtain a franchise.

Thus, I do not find that Schmidt's likely recovery on the merits of its contentions re. ¶ 2 of the Agreement is threatened by ¶ 3.

---

[12]

I note that ¶ 3 uses the term "grant," rather than "award." DaimlerChrysler has not suggested that "grant" and "award," as used in the Agreement, are synonymous. Even if they are, this provision refers to a "grant" to *both* Yark and Schmidt. This is a further indication that the parties contemplated parity of treatment of both dealers.

15

### 3. Irreparable Harm

I conclude that Schmidt will be harmed irreparably if an injunction does not issue to keep DaimlerChrysler from allowing Smith to move to its forty-acre property during the pendency of this lawsuit.

By being assured in the Agreement that it would get a franchise if Yark received one, Schmidt also was assured, at least indirectly, that the value of that franchise would be protected by the § 4517.50(A) right of protest. DaimlerChrysler was in a position to assess the value of that right vis-a-vis Schmidt and Smith, as DaimlerChrysler was aware that Smith had been interested since 1996 in relocating.

In the Settlement Agreement, Schmidt and Yark mutually waived any right each might otherwise have had to protest the other's receipt of a Chrysler franchise. But neither waived such right as to any other dealer who might be given a Chrysler franchise within the ten-mile zone of §4517.50(A).

I am persuaded that the right of protest provided by that section is important – if for no other reason – because, as Schmidt points out, DaimlerChrysler has the burden of proof of showing good cause for its decision to permit another Chrysler dealer within the ten-mile zone.[13]

Schmidt claims that it will be harmed irreparably if the injunction does not issue. That is so, Schmidt asserts, because, without the injunction it is likely that Chrysler will permit Smith to relocate. Aside from the commercial advantages that Smith thereby will gain – the ability to sell cars

---

[13] If Chrysler met that burden, Schmidt would lose the protest, and Smith could relocate. The protection of § 4517.50(A) creates a barrier, not an absolute bar. In doing so, the statute balances the interests of the public in healthy and effective competition with risks resulting from the franchisor-manufacturer's greater economic and other power vis-a-vis any individual dealer.

16

from a venue closer to the core of Schmidt's customer area – Smith will gain the ability to protest any acquisition by Schmidt of a Chrysler franchise that would enable him to operate that franchise at its Perrysburg location.

In other words, something that Schmidt would have enjoyed – protest rights under § 4517.50(A) vis-a-vis Smith and other intruders – had it been given a Chrysler franchise in 2003 concurrently with Yark, will be lost, and perhaps irredeemably so. As important, from Schmidt's perspective, is the fact that its nearest competitor, if awarded a franchise within the ten-mile zone, will have also acquired that which Schmidt will have lost – the right of protest under § 4517.50(A). In addition, as James Smith forthrightly testified, Smith expects to exercise that right against Schmidt – the very dealer which, if it prevails in the instant dispute, should have been able to use it against Smith's incursion.

DaimlerChrysler argues that the loss of a statutorily provided right cannot, at least outside the state-action/due process arena,[14] be viewed as irreparable in the context of an application for a preliminary injunction.

In the context of this case, Schmidt's claim of irreparable harm is well taken. Through the injunction, Schmidt simply seeks to keep Smith from moving within the ten-mile zone protected by § 4517.50(A) until this case reaches final adjudication. If the injunction does not issue and Chrysler permits Smith to relocate, Schmidt will lose the right – which would have arisen had Schmidt obtained its own Chrysler franchise in 2003 – to protest Chrysler's approval of Smith's relocation.

---

[14] *See, e.g., Goldberg v. Kelly*, 397 U.S. 254 (1970), in which the Supreme Court held that once granted by the State, a statutorily mandated right could not be withdrawn without due process, even though the State had been under no pre-existing obligation to create the right.

17

Moreover, if Smith relocates and Schmidt subsequently obtains a Chrysler franchise, Smith could assert a right of protest against Schmidt.

Thus the right of protest that Schmidt should have had since Yark got its franchise will, if no injunction issues, not only be lost to Schmidt: it will be gained by Smith, the very party against whom Schmidt most likely would exercise the § 4517.50(A) rights.

Thus, an injunction is necessary to preserve fully Schmidt's rights under the Agreement, if it prevails. While it might recover monetary damages for lost sales, and such damages would otherwise preclude injunctive relief, recovery for the peculiar and otherwise irredeemable consequences of the breach will remain incomplete.

### 4. Harm to Others

The prospective harm to Smith does not justify refusing to grant injunctive relief to Schmidt. Smith will be no worse off if the injunction issues than it would have been had Schmidt obtained a Chrysler franchise several years ago.

At this point, moreover, Smith appears to have been far from diligent in pursing its desire to relocate. It has owned its forty-acre property for nearly thirty years; in 2001 it received, but did not act on, a go-ahead from DaimlerChrysler, about which Schmidt could then have done nothing. It has slept on its opportunities; no matter how awake it now is, its concerns do not outweigh the impact on Schmidt of withholding the injunction.

Smith, moreover, may still be able to prevail in the face of a protest by Schmidt if DaimlerChrysler renews its approval for Smith to relocate. As noted, § 4517.50(A) creates a barrier, not an absolute bar. That barrier can be overcome if DaimlerChrysler shows good cause for approving a later move by Smith into Schmidt's ten-mile zone. O.R.C. §§ 4517.57(C), 4517.65(D);

*see General Motors Corp. v. Joe O'Brien Chevrolet, Inc.*, 118 Ohio App. 3d 470, 475 (1997). Allocation of that burden to DaimlerChrysler, especially if it is found liable for a breach of the Settlement Agreement, is entirely appropriate.

### 5. Public Interest

That the right to seek to keep a competitor more than ten miles distant is an import right is manifest from the statute itself. The right necessarily embodies an important public policy – keeping franchisor-manufacturers from acting unconscionably toward franchisee-dealers, over whom franchisors otherwise generally have substantial economic and other power. Withholding injunctive relief would undercut that policy, as it would permit DaimlerChrysler to ignore the purpose of a settlement to which DaimlerChrysler was a party and to favor two dealers at the expense of a third.

Unfair dealing by a manufacturer is contrary to Ohio public policy. Public policy also favors enforcement of contracts. Granting the injunction sought by Schmidt furthers those policies, and, so far as I can tell, offends no countervailing public policy.

### Conclusion

It is, for the foregoing reasons

ORDERED THAT pending further order of this Court, the defendant DaimlerChrysler Motors Company, its successors and assigns, agents, officers, employees, and anyone or any entity acting or purporting to act in concert with it or them or on its or their behalf all be, and the same hereby are enjoined and restrained from considering, authorizing, or approving any relocation or transfer of the Al Smith Chrysler Dodge, Inc. Chrysler franchise to a location within ten miles of the premises of the plaintiff Ed Schmidt Pontiac-GMC Truck, Inc.

So ordered.

                                        <u>s/James G. Carr</u>  
                                        James G. Carr  
                                        Chief Judge